ROBERT WHITE ET AL. *vs.* JOSEPH WHITE.—*December*, 1847.

In the year 1814, a partnership consisting of *four* persons, existed. In that year a *fifth* partner was added. In 1825, *one* of the original partners withdrew from the firm. In 1835, *another* of the original partners withdrew. In 1843, the *fifth* partner withdrew, and filed a bill requiring a settlement and account of the partnership concerns from 1814 to 1843, against all the four original partners. To this bill all the original parties demurred, upon the ground of multifariousness. *Held,*

1. That in deciding this question, the attention of the court is confined to the bill itself. It arises upon demurrer, which admits every thing in the bill, properly introduced into it, to be true.

2. The complainant, admitted into a partnership which had previously existed, as a partner, is not responsible for its previous debts.

3. A dissolution of a partnership may be brought about in various ways, and among others by a withdrawal of one of several partners from its business.

4. The partners, who retired in 1825 and 1835, may affirm that this bill is to burthen them with expenses which they are not bound to incur; to swell the pleadings with the state of the several claims, with which they cannot be said to have any connexion after they respectively withdrew.

5. Where an agent of a firm, against whom no decree can be obtained upon the allegations of the bill, is made a defendant with the members of the same, he may demur to the bill as multifarious.

6. A bill should not confound distinct matters, or blend several matters distinct and unconnected, nor demand several matters, of distinct natures, against several defendants.

7. So upon a bill against co-partners for a settlement and account of partnership concerns, a claim to impeach a judgment, and mortgage given by the firm to one of its agents, ought not be included, nor such agent made a party defendant. The agent has a right to have such claim decided alone.

8. When a bill is liable to be dismissed for multifariousness, it ought to be dismissed *in toto.*

9. Where a bill is demurred to, the demurrer overruled, the defendants ordered to answer over or plead by a given day, and failing to answer, a final decree was passed against them, which, among other things, decreed a sale. Under the act of 1841, ch. 11, sec. 1, they may prosecute an appeal.

APPEAL from the Court of Chancery.

The bill in this cause was filed on the 21st September, 1844, by the appellee, *Joseph White,* and alleged that about the year 1814, he was taken into the partnership, then existing under the title of *John C. White & Sons,* in the city of *Baltimore,*

and *John White & Co.* in the city of *New York,* both of which firms were composed of *John Campbell White, Robert, John,* and *Campbell P. White,* and engaged in the general business of merchants and in the business of distilling; that in addition to an interest or share of the profits, your orator was to be allowed the sum of $2000 a year, for the extra care, trouble and time he was to give to the business. That your orator accordingly took charge of the said business as the active and managing partner, and so continued, until on or about the 7th March, 1835, trusting that its results had been profitable, as indeed he now avers and charges them to have been, to all concerned; that the books of the said partnership were kept by *Henry White* of the city of *Baltimore,* who acted as the agent of the said firms, and so continued to act through all the changes hereinafter mentioned in the persons interested therein, both in buying and selling, and also in providing from time to time any additional funds that might be necessary for the continuance of its operations. That during all that time, your orator had never examined the books, or become aware from his own personal knowledge, of the profits of the business in which he had been engaged, although he had good reason to believe, and does now believe and charge, on the representations made to him, as well by the said *Henry* as by the said *John White,* who assumed to act, and did act for all the partners, and well knew of and directed all the operations of the said firm; and from the general nature of the business, which was conducted with skill, diligence and economy by your orator, that large profits had been made and the capital largely increased; that about the year 1825 or 1826, the said *John White* withdrew from the said firm, but on what terms and after what settlement with the other partners your orator does not know, and never has been informed—certainly without any settlement or consultation with your orator; that the said partnership and business were continued under the same name and style as before by the other partners, and your orator, the said *John* acting as the adviser of all the partners, and exercising the same control as when interested in their operations; that

on the said 7th March, 1835, the said *Robert White* having also withdrawn from the said partnership, after what settlement, if any, or on what conditions your orator does not know. Your orator, the said *John Cambpell White* and *Campbell P. White*, agreed to carry on the said partnership and business in the city of *Baltimore* under the name and style of *John C. White & Sons*, and in the city of *New York* under the name and style of *Campbell P. White*, whereupon articles were prepared solely and exclusively for the purpose, as your orator was informed and believed, of settling the terms and conditions on which their future operations were to be conducted, which on being presented to your orator, with the assurance that such were their object and import, he signed without reading, and without having ever examined the books and accounts of the said partnership, or his private account, or any balance sheet, and without being aware of the state of the accounts of either of the partners, or of those who had retired as aforesaid from the firm; that the said partnership continued under the said articles, to be conducted as before, until the 18th May, 1843, when it was dissolved by your orator, no business having been done at the distillery for some months before, and especially since the August preceding, when your orator discovered that his partner, *Campbell P. White*, who had no personal knowledge of the concerns of the firm, and resided in the city of *New York*, had signed the name of *John C. White & Sons* to a note in favor of the said *Henry White*, for the sum of $38,595 24, without consultation with or the knowledge of your orator; that during the whole time that the said *Henry White* acted as the agent of the firm, and up to the time when the said pretended indebtedness occurred, your orator had been as above mentioned the active partner, and as such alone authorized, and the only one of the partners who signed the name of the last mentioned firm, all of which was well known to the said *Henry* and the said *Campbell P. White;* that although the said *Henry* lived in the same city with your orator and the other partner, *John Campbell White*, and was in the habit of daily and friendly intercourse with them, he had never asked either your orator,

46     v.5

or the said *John Campbell White*, for a settlement, or in any way intimated that any such indebtedness existed, or was pretended to exist, but on the contrary, your orator had been a short time before informed by the said *John White*, who was well acquainted with the books and business of the firm, and who, if he did not obtain his information from the books, received it directly from the said *Henry*, that the firm owed no money: and when your orator called upon the said *Campbell P. White* in relation thereto, he acknowledged, as your orator well knew and now charges to be true, that he had signed the said note without having made any examination of the said books. And your orator verily believes and therefore charges, that no such indebtedness did in fact exist, and that the whole proceeding was the result of a confederacy between the said *Campbell P., Henry*, and the said *John White*, who assumed to act as the attorney of the said *Campbell*, and to control all the other partners as aforesaid, to defraud your orator; that about the month of March, 1842, and while the business of the said firm was prosperous and profitable, and your orator had good reason to believe, that all concerned were satisfied with its results, he was surprised and astounded by the refusal of the agent, the said *Henry*, to furnish the necessary funds out of the proceeds of the said business, for the payment of the hands, and by his detention of the grain then in his custody; which proceeding your orator believes was at the instance and by the advice of the said *John White* and the other confederates, and was designed to operate, and did operate to the injury of your orator; that for the purpose of further injuring your orator and ruining his credit, the said *John White* gave out, that your orator was largely indebted to the said firm, that is to say, in the sum of about $15,000; that your orator becoming alarmed by the course thus pursued, and finding it necessary to attend to his own interest and guard his own rights more carefully than he had done before, demanded of the said *Henry* and the other partners, an examination of the books of the said partnership, and of the said *Henry*, and a settlement of the said business and firm, which request was, to his surprise, positively refused ;

that at the time the said demand was made by your orator, the said *John White* assuming, though in the presence of the said *John Campbell White* and *Henry White*, to act for them and all the others, said that no person should ever see the said books, although your orator, in the spirit of conciliation and with an earnest wish to avoid all controversy, and bring his own affairs to a speedy settlement, offered to refer them to any three persons that he and his confederates, and the other partners might select; that in the spirit with which the said refusal was made, the books have been withheld to this time, and the said partners and confederates well knowing, that on a correct accounting a large sum of money would be due to your orator, have ever since refused, and still refuse to come to a settlement, so that your orator has been kept to this day in complete ignorance of the extent of his rights, while the said *John White* and the said partners have at various times given out and charged that he was indebted to them and the said firm in about the sum of $25,000, which allegation he avers to be unfounded; that the said *John Campbell White*, who is your orator's father, has never taken any active part in the said business, and knows nothing thereof, except as he hears it from the said *Henry*, *Campbell P.* and *John White*, who, your orator charges have combined and confederated together, as well for the purpose of injuring your orator as the said *John C. White*, in the premises; that the said *John C. White* is old and infirm, and entirely incapable of attending to business, and by the fear of the said confederates, and by their undue and improper practices, directed at their will and pleasure, so as to be used to your orator's and his own injury, though your orator well knows that weak and decrepid as he is, he would neither injure him or any other person, if allowed, and capable of learning the true state of the facts connected with the said partnership, and all the proceedings of the said confederates. Your orator knows not what interest the said *John White* may now have, if any, in the affairs of the said partnership, other than as the attorney of the said *Campbell P. White*, but he charges that it has been by his advice, assistance and connivance, that your

orator's reasonable requests for the books, or an examination thereof, have been refused, and all his endeavors for a speedy and amicable adjustment of the affairs of said partnership utterly frustrated; who, for that purpose, has combined and confederated with the said *Campbell P.* and *Henry White*, although your orator has, as he charges, made various efforts for the purpose of adjusting all disputes on the most equitable terms and in the most speedy and economical manner.

But so far have your orator's advances from being properly met, that when he demanded the said books from the year 1814 to the close of the partnership, your orator was informed that he had already confirmed all the accounts, charges and books up to the year 1835, so as to preclude himself from making any examination prior to that time, or correcting any false or erroneous entries or charges that might have been made or committed by the partners, or their agent, or by the said *John White*, or by the said agent, at his suggestion, and under his direction; whereas your orator avers, that he never designed to enter into any such agreement, as he had never examined the said books and accounts; and if any such agreement or stipulation was included in the articles he signed, it was fraudulently inserted, with a view of deceiving your orator, and putting him at the mercy of the said confederates. What were the contents of the said agreement, your orator does not know, as he has never seen it since its execution, but only what purports to be a copy, in the handwriting of the said *Henry White;* the said paper having ever since continued in the possession of one or other of the said confederates; that the said books do not, in many particulars, exhibit a correct account of the said partnership; and especially in this, that he has never been credited, as he ought to have been, with the sum of $3,000—the value of certain property adjoining the distillery, which in the year 1835, he conveyed to the said firm for its accommodation, and to enlarge the sphere of its operations; that soon after the said *Henry* obtained the note of the firm as above mentioned, he instituted proceedings at law for the recovery thereof; and having by the means and instrumentality

of his confederates, obtained the consent of the said *John Campbell White* thereto, a judgment was entered thereon. That the said *Henry*, having on hand a large amount of spirits belonging to the firm, applied the same in part satisfaction of the said judgment, without the consent of your orator, and finally demanded a mortgage of all the partnership property to secure the residue. That after practising on the fears of the said *John Campbell White*, the said confederates procured his assent thereto; and your orator to free his father from any further annoyance, but with a solemn protest against the whole proceeding, and against the justice of the said claim, joined in its execution; that the said confederates in further pursuance of their plans to injure your orator, and deprive him of his reasonable and just portion of the funds and property of the said partnership, procured a bill to be filed in your Honorable court by the said *John Campbell White*, for the appointment of a receiver, and the settlement of the affairs of the said firm: but that although your orator's answer was filed as far back as the 16th October last, and within three months after the filing of the said bill, no steps have been taken to obtain the voluntary answer of the said *Campbell P. White*, or to obtain an order of publication against him, so that the said cause may be brought to issue, and the matters of the controversy between your orator and the other parties, examined, adjusted and settled, according to the principles of equity and good conscience. In the meanwhile, the said partners have procured a lease of the property of the firm, at a rate no more than sufficient to pay off the annual incumbrances thereon, and thus succeeded in accomplishing their purpose of obtaining possession of all the property, as they had previously had of the funds of the said partnership, and are now willing, as their proceedings show, that the said cause shall forever remain in its present position. But your orator, on the contrary, whose funds have been thus withheld from him, by the fraudulent contrivances of the said confederates, is deeply interested in closing all controversies by a full, fair and complete examination of all his acts and doings, in and about the said business, so that he may, at an

early day, obtain what is justly due to him, and pay over to his co-partners, as he now offers himself ready to do whatever, on a just accounting, may be found due from him ; that by reason of the partnership property being kept out of the market, when it ought to be sold, he is suffering grievous loss and injury, and the other partners and confederates are obtaining all the advantage thereof, and of the labor, diligence and skill of your orator given to the said business for nearly thirty years, all which doings, &c.

*Prayer*, that the said *John C.*, *Campbell P.*, *John* and *Robert White*, (the said *Campbell P. White*, and the said *Robert White* being non-residents) account with your orator of and concerning the said partnerships, from the time your orator became a member thereof to their dissolution ; and for that purpose, that they may be compelled to produce all the books of the said partnerships; that the said *Henry White* may also account with your orator of and concerning his agency, from the same period to the present time; that the said judgment and mortgage may stand security for no other or greater sum than on such accounting may be found justly and fairly due; and if nothing is due, may be set aside, vacated, and annulled; and that all the partnership property may be sold forthwith, and the proceeds applied as may be most equitable. And for further relief, &c., &c.

On the 30th September, 1844, an order of publication was obtained against the non-resident defendants, *Campbell P.* and *Robert White*, which was duly published. The other defendants were summoned and appeared.

At December term, 1844, attachments to answer were issued against the resident defendants. At March term, 1845, the attachments were returned, attached.

The defendant, *J. C. White*, demurred to the bill, because it was for several and distinct matters and causes which have no relation to, and are independent of each other; and wherein and in part whereof, this defendant is in no wise interested or concerned, and ought not to be implicated. For which, &c.

The defendant, *John White*, demurred separately on the same grounds, as also *Henry White*.

Upon petition of the complainant, the Chancellor (BLAND) ordered the demurrers to stand for hearing on the 8th July, 1845, provided, &c.

At July term, (16th July,) the Chancellor overruled the demurrers, ordered each of the demurring defendants to be taxed with the costs of the demurrer, including a solicitor's fee, and the sum of five pounds current money. And that they respectively be in contempt until the costs, &c. be paid; and that the cause stand over with leave to the said defendants to answer or plead to the said bill, on or before the 1st day of September next, 1845.

At September term, 1845, the Chancellor (BLAND) passed the following decree:

This cause having been set down for hearing on the demurrers of *John C. White, John White,* and *Henry White,* and the said demurrers having been overruled by the order of the 16th July last, and the case having been thereby ordered to stand over, with leave to the said parties to answer or plead to the complainant's bill, on or before the first of September following; and the said parties having failed to answer or plead as allowed by the said order, and the order of publication heretofore passed in this cause having been duly published, and the said absent defendants having failed to appear and answer the bill of the complainant; it is thereupon, this 9th October, 1845, by, &c., adjudged, ordered and decreed, that the said bill of complaint be, and the same is hereby taken, *pro confesso,* against the said defendants.

And it is further adjudged, ordered and decreed, that the said parties account with each other, of and concerning the matters in the proceedings mentioned; and that the net proceeds of sale stand security for the mortgage and judgment claim of the said *Henry White* to such an extent only, as on accounting may appear justly due to him; and that this cause be referred to the auditor, with directions to take an account of and concerning the said matters from the pleadings, and proofs, &c.

And it is further adjudged, ordered and decreed, that the real and personal partnership property in the proceedings mentioned be sold; that *Henry Hardisty, Jun'r*, of the city of *Baltimore*, be, and he is hereby appointed trustee to make such sale, and that the course and manner of his proceedings shall be as follows:   He shall first, &c.

The resident defendants on the 27th September, 1845, petitioned for further time, and until about the 6th November, to answer the bill, on the ground of their solicitor being necessarily absent from the State ever since the overruling of the demurrer.   This was objected to by the complainant, and therefore overruled by the Chancellor on the 1st October, 1845.

On the 20th October, the defendants *John* and *Henry White* renewed their petition for leave to answer the bill, enlarged the grounds on which their prayer was founded, and tendered answers with it.   And at the same time, *C. P. White* preferred a similar petition as to the decree, *pro confesso*, against him, and also tendered his answers to the original bill.

On the 22d October, these petitions were severally dismissed with costs.

The said defendants then appealed from the decree of the 9th October, and the order of the 22nd October.

On the 28th November, 1845, *John C. White* preferred his petition, accompanied with an answer, for leave to file his answer, and rescind the decree against him, which was also dismissed, when he also appealed from the decree and order.

Similar proceedings were also had on the part of *Robert White*.

By agreement, these appeals were all tried upon the same transcript from the Court of Chancery.

The cause was argued before Archer, C. J., Dorsey, Chambers, Spence, Magruder, and Martin, J.

By J. M. Campbell and T. S. Alexander, for the appellants, who insisted :

1st. That the bill is multifarious in blending the matters of

account of *Henry White's* agency with those of the partnership generally, with which *Henry White* had no connection, and in which he has no interest; and in blending the accounts of the partnership anterior to the year 1819, in which *John White* was interested, with those of the partnership subsequent to that date, in which he had no interest; and in blending the accounts of the partnership anterior to 1835, in which *Robert White* had an interest, with those subsequent to that date, in which he had no interest. *Sto. Eq. Pl.* 271, 530. 1 *Dan. C. Prac.* 437. 3 *Lib. Law & Eq.* 259, 263. *Campbell vs. Mackay,* 13 *Eng. Con. Ch. Rep.* 550. *Saxton vs. Davis,* 18 *Vesey, Jr.* 72. *Gaines et ux. vs. Chew,* 2 *Howard,* 643. *Harrison vs. Hogg,* 2 *Ves. J.* 323. *Stuart vs. Coalter,* 4 *Randolph,* 85.

2d. That the bill ought not to have been taken *pro confesso* against *John C. White, John White,* and *Henry White,* on their failure to answer within the time limited by the order of the 16th July, 1845; but the complainant ought to have resorted to the usual processes of attachment, &c. to compel answers. *Gas Light Co. vs Peale, Ms. Dec.* 1826. *Buckingham vs. Peddicord,* 2 *Bland,* 447. *Winter vs. Tiernan, Ms. Dec.* 1836. *Dan. C. P.* 391, 661. 1799, *ch.* 79, *sec.* 2. *Birch vs. Scott,* 1 *Bland,* 114.

3d. That it is competent for the court to set aside a decree regularly entered, for the purpose of admitting an answer disclosing merits, where the application is made within a reasonable time after the decree. It will be insisted that the petitions of the above named defendants excuse their defaults; and that the answers tendered disclose merits which are proper to be admitted. *Beames' Orders,* 249, 1676. 2 *P. Wms.* 481. *Hill vs. Turner,* 2 *Ves. & Bea.* 372. 2 *Bland,* 447, 450, 458. 1785, *sec.* 19. *Kemp vs. Squire,* 1 *Ves. Sr.* 205. *Benson vs. Vernon,* 4 *Bro. Par. Cas.* 546. *Williams vs. Thompson,* 2 *Bro. C. C.* 279. *Wooster vs. Woodhull,* 1 *John. C. R.* 539. *Birch et al. vs. Scott,* 1 *G. & J.* 393. *Oliver vs. Palmer & Hamilton,* 11 *G. & J.* 147. *Pinkney vs. Jay & Mason,* 12 *G. & J.* 83. *White vs. White,* 7 *G. & J.* 209.

4th. That the non-resident defendants, *Campbell P. White* and

47     v.5

*Robert White*, were entitled *ex debito justitiæ* to file their answers at the time they were tendered; and were it otherwise, they have sufficiently excused their defaults.

5th. That the decree is erroneous in directing the partnership property to be sold clear, and discharged of the mortgage of *Henry White*, and especially on credits. As mortgagee, he had a right to retain his security until he should be redeemed fully; and to insist that the sum really due on his security should be ascertained before any decree whatever should be entered against him.

6th. That the decree is erroneous also in this, that it does not distinctly ascertain and declare the extent of the liabilities of the several parties; but leaves such liability to be collected by inference from the averments in the bill itself.

7th. The appellants will further insist, that if the decree should be reversed on the first point, the bill ought to be dismissed absolutely; that upon the practice of this court, the same consequence should flow from a reversal on the second ground: that it is competent for the court on reversing a decree for any ground, in its discretion, to pass such decree as the court below ought to have passed, or to remand the cause to the court below for further proceedings, on such principles as equity may dictate; and that if the decree in this case should be reversed, the purpose of justice will be advanced by remanding this cause to the Court of Chancery, with authority to admit the answers of the defendants. *Gibbs vs. Claggett et al.* 2 *G. & J.* 27.

8th. There must be one month's time between the last publication of the order against a non-resident, and the time of taking a bill *pro confesso*.

By McLean for the appellee.

The appellee in this case will contend first—that no appeal could properly be taken, or ought to be allowed from the decree below, or any of the orders subsequent thereto, because,—

1st. The proceedings shew that the decree is only for a settlement and winding up of a partnership, which the demurrers

had admitted to exist, and upon the accounting thereby, directed it may be that the final decree would be against the complainant, in which event, there would be nothing to appeal from.

2d. The answers accompanying the several petitions, shew the decree to be correct in every necessary particular; the dispute about the true state of accounts not being thereby settled at all, and its object being to obtain by an account, the means of settling what was so disputed, in order to a final decree, in which the rights of the partners might be adjusted completely and definitively.

3d. The decree, for the sale of partnership property, does not in any way partake of the character of a final decree. A sale in partnership cases being usually ordered without waiting for a final hearing; a decree for that purpose is in no manner final. 1841, *ch.* 11.

4th. No appeal will lie from the orders refusing to receive the answers of the non-resident or resident defendants. 1830, *ch.* 185. 1 *Swan*, 506.

5th. If the decree appealed from is final, then the non-resident defendants ought not to have been allowed to file their answers; and if it was not final, then the other defendants have no right of appeal.

And the appellee will further contend, that if the appeal should be allowed, the decree of the court below, and the several orders, ought to be affirmed, because,—

6th. The bill is not multifarious, includes no unnecessary parties or interests, and seeks relief against no party whatever, whom it does not show to be interested in the account and decree asked for. 1 *Dan. Prac.* 392. *Dimmock vs. Bixby*, 20 *Pick*, 377. *Skepp vs. Harwood*, 2 *Swan*, 622. *Att'y Gen. vs. Young*, 3 *Vesey*, 209.

7th. The decree, *pro confesso*, was, according to the equity and true intent and meaning of the acts of Assembly in this State, for saving delays in the Court of Chancery, in proceedings against obstinate and negligent defendants, and according to the practice of that court, the remedy to which the complaintant was entitled. *Leavitt vs. Cruger*, 1 *Paige*, 422.

*Denison vs. Bassford,* 7 *Paige,* 372. *New York Chem. Co. vs. Flowers et ux.* 6 *Paige,* 654. *Trust & Fire Ins. Co. vs. Jenkins,* 8 *Paige,* 593, 594. *Wood vs. Strickland,* 2 *Ves. & Bea.* 157. *Nabob of Arcott vs. The East I. Co.* 3 *Bro. C. C.* 292. *Griffith vs. Wood,* 1 *Ves. & Bea.* 540. *Alex. Md. Prac.* 59.

8th. The petitions of the defendants do not in any manner excuse their default, and the answers accompanying the same, shew no defence that they could not have had the benefit of, before the auditor, or at the final hearing after the account; and especially no defence against the said decree for an account and sale of partnership property.

9th. The proceedings, as they now appear before the court, show, that a sale and a decree for an account are the true and proper remedies; and if the parties appellant are entitled to a reversal at all, it will only be for the purpose of allowing their answer to avail before the auditor, and at the final hearing, as if put in before the decree of the 9th day of October, 1845.

10th. The appellants are not entitled to a reversal as mentioned in the fourth point, because they were all in default; and although there may be more inconvenience in making their defence before the auditor, they will not be precluded therefrom, and the court will not reverse merely for the convenience of a defendant who is in default. *Geary vs. Sheridan,* 8 *Ves. J.* 192. *Knight vs. Young,* 2 *Ves. & Bea.* 182.

11th. All the matters stated in the answers, appended to the several petitions, and offered to be filed as such, might be properly used as evidence before the auditor, whether an order to that effect had been passed or not: so that there was no need of opening the decree, as justice did not require it on the showing of the answers; and no need for an order to allow them to be used before the auditor, as the facts might be there shown without any order to that effect.

12th. If one month from time of passing the order of publication has elapsed, and the order be published once a week for three successive weeks, the decree *pro confesso* may pass at the end of the month.

By MEREDITH for the appellee.

I propose to argue a single proposition. The objects of the bill is to settle partnership transactions from 1814 to 1843, and for an account. The defendants are guilty of great delay, and only purposed to answer after their demurrers were overruled. There were three separate demurrers. Two defendants, *Robert* and *Campbell* did not demur. Two of the defendants who demurred had no cause of demurrer. They were partners from 1814 to 1843, and always interested in the objects and subjects of the bill. Is multifariousness in regard to one defendant applicable to all? It is not so. *Campbells vs. Mackay*, 1 *Mylne & Craig*, 602, 603. *Saxton vs. Davis*, 18 *Ves.* 72.

The case in 2 *G. & J.* 14, does not touch this point. There it extended to all the defendants. The rule stands to prevent, as far as practicable, a multiplicity of suits. Chancery demands the presence of all parties in any way connected with the cause. Courts incline against multifariousness. It is only noticed when essential to the justice of a cause. *Ward vs. Duke of Northumberland*, 2 *Anstreth*, 469.

*Harrison vs. Hogg*, 2 *Ves.* 323. 1 *Sim. & Stua.* 561, are cases of misjoinder.

The claims here are not of a different character; they all relate to the same subject matter.

Where the claim is single, all interested must be parties though they differ in degree. 6 *Jno. C. R.* 157. A bill against several persons must relate to the same subject. Chancellor Kent lays down the true rule. *Salvidge et al. vs. Hydge et al.* 5 *Maddox*, 138, 145. 3 *Lib. Law & Eq.* 260. *Dan. Prac.* 439. *Jacob C. R.* 151. *Campbell vs. Mackay*, 1 *Myln. & Craig*, 620. 2 *How.* 169, adopts the opinion of *Sir John Leach. Fellows vs. Fellows*, 4 *Cowen*, 698. *Coop. Eq.* 310.

*John White* was a necessary party. There was no settlement with him at the time of his withdrawal. The statement of this is not positive, but explicit enough. There was no settlement with the knowledge of *Joseph.* This is reasonably certain. *Sto. Plea. in Eq.* 355, *No.* 1.

*John White* has a common interest, centering in the partnership accounts. In their final adjustment, they are necessarily and intimately connected. They resemble two estates connected together. *Lewis vs. Edmond,* 6 *Simon,* 251. *Whaley vs. Dawson,* 2 *Sch. & Lef.* 370. 1 *Atk.* 282.

*Henry White* was a necessary party on the ground of fraud, and to vacate a judgment lien on the partnership effects.

By REVERDY JOHNSON for the appellants, in reply.

What is the test rule as to multifariousness? Chancery will avoid multiplicity of actions : but will not decide in one bill on cases which involve different principles of law, distinct grounds, and require the application of different rules of evidence between the parties.

From 1814 to 1825, *John White* was never called on to account. *Henry* was never a partner. He was merely an agent, to buy and to sell, either a debtor or a creditor of the firms. Has nothing to do with the state of accounts between the partners—not concerned in their settlements. This bill cannot be amended. What part of the case, and which of the defendants, can the complainant amend, or retain? There is no alternative but to dismiss the bill.

The defendants asked for an enlargement of time to answer during September, 1845; the term at which the decree was passed. This was refused. The court will take judicial notice of the beginning and end of the terms of court. The September term commenced on the fourth Tuesday of September, and terminated on the first Tuesday of the following November. The decree passed on the 9th October. On the 20th October, at the same term, the *first* application was made to enlarge the time to answer. This was refused.

An order to take a bill *pro confesso,* is not to be confounded with a decree *pro confesso.* An order is for the purpose of notice. The order of July, 1845, gave the defendants time to answer until 1st day of September, 1845. Under it the defendants might plead or answer *de novo.*

A decree *pro confesso,* is final. Now look at the order in

this cause. It is upon the overruling the demurrer that the cause stand over with leave to answer on or before 1st September; and this was followed by a decree without any notice to the failing party—no notice of intent to ask for it or afford any opportunity to make an excuse. Now, I maintain, that all the process of contempt, according to our acts of Assembly, should have been resorted to and run out, before the bill was taken as confessed. *Bland*, 451.

Upon the cases cited by the opening counsel, the time for decree had not arrived in this case. The decree is not justified either by the *English* practice, or our legislation. *Dan. Prac.* 95.

The demurrer being overruled, the complainant is bound to proceed as if it had not been filed. It is like an insufficient answer, which is no answer.

As to *Robert White*, a non-resident, there must be a non-suit. The court had no jurisdiction to decree against him. In this case, to call him to an account, there must be jurisdiction over his person. There is no other ground of jurisdiction asserted in the bill.

All the partnership property of 1835 went into the new concern, in which *Robert* was not interested—no property in *Maryland* to affect him—no interest in it. Jurisdiction as to *Robert* fails both as to person and property. He is protected by the Constitution of the *United States.* He could not be sued in *New York*, upon the decree here in *Maryland.* As to him, the decree is a nullity. He proposes by his answer tendered and refused to show he is released, has a meritorious defence. His answer would have protected all the other defendants; and he should have been permitted to appear and defend. Moreover, he may appear under the act of 1795, ch. 88, within eighteen months of date of decree, and file a bill of review. *Pinkney vs. Jay & Mason*, 12 *G. & J.* 69.

The defences were not opened before the auditor; after decree, *pro confesso*, he is bound to account. 2 *J. C. Rep.* 629. 1 *Jacob*, 49. 3 *Myln. & Craig*, 191. *Oliver vs. Palmer & Hamilton*, 11 *G. & J.* 426.

Under act of 1842, a month's notice, by publication, must be given to defendant to come in—a month must elapse. Here only three weeks notice given.

As to all these defendants, their answers should have been received. The refusal of the Chancellor to receive them was error. *Birch vs. Scott,* 1 *G. & J.* 393, 426. 2 *Bro. C. R.* 279. 12 *G. & J.* 83. *Oliver vs. Palmer & Hamilton,* 11 *G. & J.* 137, 147.

A decree under the act of 1820, in respect to this error, is not distinguishable from other decrees.

Was the decree appealed from a discreet act? The facts are all one way. The decree does not depend on the consent of the opposing counsel. To pass such a decree is a matter of legal discretion. Consent in such case may be controlled by the Chancellor. He may decide against it. The answers of some of the defendants, and petitions filed within ten days of decree, and from the nature of the answers, the facts of the bill must be erroneously charged.

The acts of 1785, ch. 72, sec. 30; 1795, ch. 88, sec. 1; 1799, ch. 79, sec. 1, show that the Chancellor had a discretion in this cause: might have issued a commission for proof.

MAGRUDER, J., delivered the opinion of this court.

The very many points, which it is supposed arise on this appeal, have been argued by the counsel with great ability. If, however, one of the objections urged by the appellant to the relief which is sought, be well founded, it will be unnecessary for us to intimate an opinion on other questions.

To the bill of complaint which was filed in the Court of Chancery by the appellee, some of the appellants demurred upon the ground that it is multifarious; and this court has said, (2 *G. & J.* 29) if the bill be liable to be dismissed for multifariousness, it ought to be dismissed *in toto,* and not made the foundation of partial relief.

We at once then come to the examination of this question, and in deciding it, our attention is to be confined to the bill

itself, the demurrer admitting every thing therein to be true, which is properly introduced into it.

One and the leading object of this bill is to obtain a settlement of certain partnership concerns spoken of in it. What then do we learn from the complainant himself of them, and his connection with them?

In 1814, there existed (how long it had been in existence we are not told) a partnership, consisting of the defendants, *John C. White, Robert White, John White,* and *Campbell P. White.* In the course of that year the complainant became a partner, and associated with the defendants just named, in the same business, and in the same places—*New York* and *Baltimore.*

The enquiry here presents itself, did the complainant thereby become a member of the previously existing firm, or of one just formed? *Story,* in his commentary on the law of partnerships, 438, sec. 307, says, "every partnership being founded in the voluntary consent of all the parties thereto, and that consent being founded on a *delectus personarum,* no partner has any right whatsoever to introduce a new partner into the firm, without the consent of all the other partners; and if such consent be given, then it becomes to all intents and purposes, the substitution of a new partnership for the old one, and this is equally the doctrine of our law, and of the *Roman* law, and of the modern foreign law." Of course, the complainant, until he was admitted into the concern in 1814, was no partner, and was not at all responsible for the debts of any previous partnership. The partnership thenceforth, and until it was dissolved, consisted of five, to wit, the four partners just named, and the complainant; so long as that partnership existed, each was entitled to an account of its concerns, its profits, it effects, and its liabilities. How long did the partnership formed in 1814 continue? No change took place until the year 1825 or 1826, when one of the defendants (*John White*) withdrew; and what was the effect of that withdrawal? The complainant in his bill tells us, that in 1825 or 1826, the defendant, *John White,* withdrew, whether with or without just cause— with or against the consent of the other partners, he does not

explicitly state—but he charges that subsequently to his withdrawal, the business was carried on by a firm consisting of the other partners and himself. *John*, it is admitted, did withdraw, his right to withdraw is not questioned, and it would be difficult to maintain that a member of a partnership cannot withdraw from it, without a dissolution of it. A dissolution of a partnership may be brought about in various ways, and among others, " by a withdrawal of a partner from the business of the partnership." The business was afterwards carried on by the other partners : of course, *John* was excluded from all participation in it. So things continued until March, 1835, when *Robert* withdrew, and thenceforth it was carried on by *John C.*, *Campbell P.* and the complainant, until 1843, when, as he himself informs us, the complainant retired from the partnership, and his retirement from it, he charges dissolved it.

Now no one can doubt, that either of these parties could demand a settlement of the partnership concerns during the whole time that he was a partner, provided, he demand that settlement from those, who, during the time were his co-partners. The defendant, *John White*, was entitled to demand a settlement, as well of the partnership which had existed before, as of that which was formed in 1814, but must take care to demand it of the proper persons. The complainant was a proper person to be made a party to the settlement of the concerns of the partnership formed in 1814, and which continued until 1825 or 1826. He was not a proper person to be made a party, and might have demurred to a bill, asking a settlement of the accounts of the firm, which was dissolved in 1814, because, says *Mitford*, " it would put him to the trouble and expense of a litigated question, with which he has nothing to do;" yet it would be very difficult to prove that he had not as much to do with the partnership which existed before he associated himself with its members, as the defendant, *John*, had with a partnership carried on by men who had been indeed, but had ceased to be, connected with him in business.

Some of the cases which have been cited, and as illustrative of the doctrine of multifariousness, are rather exceptions to

the general rule, which forbids multifariousness in a bill. Mention of those exceptions will be found in *Story on Equity Pleading*, 285th, and following sections. It is true that there are such exceptions, as there are to the rule which requires all persons interested to be made parties to a bill in Chancery. It can scarcely be pretended that this case can be brought within any of the exceptions.

The defendant, *John White*, may with great truth affirm, that this bill is to burthen him with expenses which he is not bound to incur, to swell the pleadings with the state of the several claims with which he cannot be considered to have any sort of connection, and by uniting in one suit a partnership, of which he was a member, with partnerships in which he had no interest, would delay the settlement of his own accounts. These, we are told by all the writers who treat of the subject, are valid objections. *Cooper*, in his *Equity Pleadings*, 183, states one other reason why multifariousness is discountenanced in equity. "It is also to prevent confusion, and to preserve some analogy to the comprehensive simplicity of declarations at common law, that this ground of demurrer has obtained." Is any thing like this tolerated in common law courts?

If the case before us had already been fully stated, there is abundant reason for saying that in the multifariousness of this bill, ample ground for the demurrer, which has been filed by the defendant, *John White*, may be found, seeking to enforce different demands against persons liable respectively, but not as connected with each other. "Even this (says *Lord Eldon*, in *Saxton vs. Davis*, 18 *Ves.* 72) is clearly multifarious."

A very large portion of the objectionable matter which the bill contains is yet to be noticed.

*Henry White* is also made a defendant, and is required to answer all the matters charged in the bill, although it is expressly stated that he was no partner, but only an agent during the several partnerships. He is required also to give an account of his agency. Why shall he not exempt himself from the expense of answering *in extenso*, all the matters which the bill requires all the defendants to answer?

· It is true that he is said to have been the financier and agent for many purposes of those various firms. Because of this, he may be a very important witness in the case. But why make him a defendant, when of his answer no possible use can be made by any of the other defendants?

It would seem that for his services as agent, he was to receive a salary, as all the persons in their service it may well be supposed were. It appears further, that he had made some efforts to secure the balance claimed by him to be due to him, and had obtained some security for it, without the consent or knowledge of the complainant, though it is admitted that he, the complainant, with the other partners, executed the mortgage, which is that security. It is not necessary here to enquire whether, as the other partners seem to have been able to settle with their agents, and to give him satisfactory security for the eventual payment of the balance admitted by them to be due to him, there was a contract between the parties, which was violated by such an adjustment as was made of the claim of *Henry.* It is also unnecessary for us in disposing of this defence, to say that the judgment or mortgage given to the defendant, *Henry,* could be set aside, if impeached in a proper way. If the judgment or mortgage is to be impeached, such a case is not to be blended with this suit with the partners about the partnership concerns, all the other parties to which have the same interest that the complainant has in reducing or defeating his claim; and if thus blended, the connection of them might greatly delay the settlement of both, and have the effect of extending the credit which the defendant, *Henry,* agreed to give to his debtors.

No doubt it ought to be the wish of courts to prevent a multiplicity of suits, and to lessen, as much as possible, the expense of ·litigation. This, however, is not to be accomplished by a denial to any man of his just rights; and if *Henry White* is to be compelled to blend his claim with any controversy between the several members of these several partnerships, and to await the end of this controversy, over which he has no control, he may not only be loaded with

enormous costs, which he is not bound to incur, but subjected to a delay, which is often more injurious than a prompt denial of justice. This must be be pronounced to be "confounding distinct matters: this is a blending of several matters perfectly distinct and unconnected: this is to demand several matters of distinct natures, against several defendants." Surely the claims united in this bill are of "so different a character, that the court will not permit them to be liquidated in one *record;* a record with a large portion of which, and of the case made by which, he (the defendant, *Henry*) has no connection whatever." Surely, the defendant, *Henry*, has a right to insist, that even if the judgment and mortgage may be impeached, and his claim contested; yet this " is a perfectly distinct case" from that between the other parties to this bill, and he "has a right to have that case discussed and decided by itself, without being mixed up in a suit," for a settlement of all the partnership concerns.

The bill asks, among other things, a settlement of the concerns of three distinct partnerships, to compel the agent of these several partnerships to come to a settlement with each of them; to set aside the settlement which it is charged that the agent has made with some of the partners. It also asks a decree, declaring that the judgment and mortgage shall stand as a security, for such sum only as it shall be ascertained is due to the agent, and to direct a sale forthwith of the mortgaged premises. This certainly is "a demand of several matters of a distinct and independent nature, against several defendants in the same bill," and in the language of *Justice Story, (Equity Pleading,* sec. 271) would be oppressive, because it would tend to load each defendant with an unnecessary burthen of costs, by swelling the pleadings with the statement of the several claims of the other defendants, with which he has no connection. Of this case also it may be said, " the proofs applicable to each are apt to be confounded with each other, and great delays would be occasioned by waiting for the proof, respecting one of the matters, when the others might be fully ripe for hearing. Such proceedings are not to be permitted

in courts of equity, which, in cases of this sort are apt to preserve some analogy to the comparative simplicity of proceedings at common law, and thus to prevent confusion in their own pleadings, as well as in their own decrees." *Story's Equity Pleading*, 3d edit., p. 296.

There are in this bill, charges, that some of the defendants confederated together for some purposes, and in *2d Vernon*, 416, there is a case in which a demurrer for multifariousness was overruled, because the charge that the defendants had combined together was not expressly denied. The charges in this bill are not such, as it would seem the case in *Vernon* would require. But of the case in *Vernon*, *Cooper*, in his *Treatise on Equity Pleadings*, says, "is denied, and is contrary to the modern practice in settling demurrers." Indeed, it cannot be the law of *England*, as it appears by some recent decisions there; that although multifariousness cannot be objected to by the defendant at the hearing, unless he has demurred, yet the court may take the objection at the hearing *sua sponte*. See cases, *Story*, p. 295, *note*. Indeed, we are told by *Lord Cottenham*, in *Campbell vs. Mackay*, (13 *Condensed Ch'y Reports*, 543) "the court in deciding cases of this description, seem to have considered what was convenient in particular circumstances, rather than to have attempted to lay down any absolute rule."

The act of 1841, ch. 11, authorizes an appeal in this case, and the case being before us, all orders and decrees passed therein are to be reviewed.

**DECREE REVERSED AND BILL DISMISSED.**